[980 NYS2d 95]

Nomura Asset Capital Corporation et al., Respondents, v
Cadwalader, Wickersham & Taft LLP, Appellant.

First Department, February 13, 2014

230

APPEARANCES OF COUNSEL

*Cravath Swaine & Moore LLP*, New York City (*David R. Marriott* and *Evan R. Chesler* of counsel), for appellant.

*Constantine Cannon LLP*, New York City (*Amianna Stovall* and *Joel A. Chernov* of counsel), for respondents.

### OPINION OF THE COURT

RICHTER, J.

In this legal malpractice action, plaintiffs allege that defendant law firm failed to provide them with the appropriate legal advice, and rendered a legal opinion without performing the necessary due diligence, in connection with the securitization of a pool of commercial mortgage loans. When one of the loans went into default, the trustee of the trust holding the mortgages brought an action against plaintiffs in federal court alleging that they had breached various warranties in the securitization agreements. Plaintiffs maintain that the alleged breach of the warranties was the result of the law firm's malpractice leading up to and during the securitization process. Plaintiffs claim that they were forced to settle the federal lawsuit for millions of dollars, and that they would not have suffered these damages but for the law firm's negligence. The motion court denied the law firm's motion for summary judgment dismissing the malpractice cause of action (35 Misc 3d 1222[A], 2012 NY Slip Op 50815[U] [2012]). We now modify to dismiss that part of plaintiffs' claim alleging that the law firm failed to provide appropriate legal advice, and to limit plaintiffs' claim that the law firm did not perform the requisite due diligence before rendering its legal opinion on the securitization.

In the mid-1990s, plaintiff Nomura Asset Capital Corporation (Nomura) was an industry leader in originating and securitizing commercial mortgage loans. Securitization is a process whereby a group of commercial mortgage loans are pooled together, sold to a special purpose entity, and transferred to a trust. Fractional interests in the pool of mortgages are then sold to investors in the form of securities, known as commercial mortgage backed securities (CMBS). As the mortgage loans are paid back, the investors receive their share of the principal and interest payments received from the borrowers.

Nomura typically securitized its commercial mortgage loans through REMIC trusts,[1] which enjoy certain federal income tax benefits (*see* 26 USC § 860D). In order to qualify as a REMIC trust, the pool of mortgages must satisfy a set of stringent tests. The Internal Revenue Code requires that substantially all of the assets in a REMIC trust be "qualified mortgages and permitted investments" (26 USC § 860D [a] [4]). A "qualified mortgage," as relevant here, must be "principally secured by an interest in real property" (26 USC § 860G [a] [3] [A]). Treasury regulations provide that one way of meeting the "principally secured" requirement is if the "fair market value of the interest in real property securing" the mortgage loan is "at least equal to 80 percent of the adjusted issue price" of the loan, either on the date the loan is originated or at the time the REMIC sponsor contributes it to the trust (26 CFR 1.860G-2 [a] [1] [i] [A], [B]).

Thus, to satisfy REMIC requirements, the fair market value of the real property must be at least 80% of the amount of the loan (the 80% test). For example, if the mortgage loan is $100,000, the real property securing the loan must be worth at least $80,000. The 80% test is expressed as an 80% value-to-loan ratio (VTL). Mortgage lenders typically use a loan-to-value ratio (LTV) in assessing whether to make a loan. An 80% VTL is equivalent to a 125% LTV. Thus, to meet the 80% test for REMIC purposes, the LTV must be 125% or less.

REMIC real property has a specific definition under the regulations, and consists of "land or improvements thereon, such as buildings or other inherently permanent structures thereon" (26 CFR 1.856-3 [d]). The term includes "structural components of such buildings," such as wiring, plumbing, and central heating and air-conditioning machinery, but excludes items that are "accessory to the operation of a business," like machinery, office equipment, refrigerators, and furnishings (*id.*).

Nomura retained defendant Cadwalader, Wickersham & Taft LLP (Cadwalader), a leading law firm in the securitization field, to advise Nomura on the legal and tax aspects of its CMBS program. In addition to providing advice, Cadwalader acted as securitization counsel for many of Nomura's securitizations, drafted the relevant documents, and rendered legal opinions. Among the Cadwalader lawyers advising Nomura and working

---

**1.** "REMIC" stands for "real estate mortgage investment conduit" (26 USC § 860D [a]).

on the securitizations were Anna Glick, a corporate partner, Charles Adelman, a tax partner, and Lisa Post-Gershon.

This litigation involves Nomura's Series 1997-D5 Securitization (the D5 Securitization), which consisted of a pool of 156 mortgage loans worth approximately $1.8 billion in the aggregate. Cadwalader drafted the securitization documents, including the Pooling and Servicing Agreement (PSA) and Mortgage Loan Purchase and Sale Agreement (MLPSA). The transaction closed on October 24, 1997 when, pursuant to those agreements, Nomura sold the loans to its subsidiary, plaintiff Asset Securitization Corporation (ASC) (collectively Nomura). ASC then transferred the mortgages into a trust (the D5 Trust), and securities representing interests in the trust were sold to investors. LaSalle Bank National Association (LaSalle) acted as the trustee.

The PSA and MLPSA contain various representations and warranties made for the benefit of the investors, two of which are relevant here. In the Qualified Mortgage Warranty, Nomura represented that each of the loans in the trust was a "qualified mortgage" for REMIC purposes. As noted earlier, a mortgage qualifies as REMIC-eligible if it satisfies the 80% test, i.e., if the loan is 80% secured by real property. In a separate warranty, the 80% Warranty, Nomura similarly represented that the real property securing each mortgage loan, as evidenced by a recent appraisal, had a fair market value of at least 80% of the principal amount of the loan at the time the mortgage was originated or included in the trust.

One of the largest mortgages in the D5 Securitization was a $50,000,000 loan made on August 28, 1997, and secured by Doctors Hospital of Hyde Park, an acute care facility in Chicago (the Doctors Hospital Loan). Prior to the loan's closing, Nomura hired an appraiser who valued the hospital at $68,000,000, using the income capitalization approach, which focuses on the income the asset will likely generate, and considers both tangible and intangible assets of a going concern, i.e., an operating business. The appraiser's $68,000,000 figure was allocated as follows: land valued at $3,000,000, building and improvements valued at $27,960,000, equipment valued at $9,640,000, and intangibles valued at $27,400,000. The appraiser also used the cost approach, which assesses the value of the land as vacant along with the depreciated replacement costs of the improvements and equipment. Under that methodology, the property was valued at $40,600,000 (comprised of the value of the land,

building and improvements, and equipment, but not the intangibles).

The appraiser did not conduct a detailed inventory of the hospital's equipment, but based the equipment value on a typical figure for similar acute care hospitals. Because REMIC real property includes some, but not all, equipment, one cannot ascertain from the appraisal whether any of the $9,640,000 equipment value constitutes real property for REMIC purposes. Based on the face of the appraisal, the only certain REMIC real property is the land, building and improvements, which total $30,960,000. The loan here was $50,000,000, so to be REMIC-eligible it needed to be secured by 80% REMIC real property, or $40,000,000. Since the $30,960,000 figure is less than $40,000,000, it would not satisfy the REMIC 80% test. Even if one were to view all of the equipment as being REMIC-eligible, the resulting value, $40,600,000, would come perilously close to not being REMIC-eligible.

On October 24, 1997, the closing date for the D5 Securitization, Cadwalader, acting as securitization counsel, rendered an opinion stating, inter alia, that the D5 Trust was eligible for treatment as a REMIC trust for federal income tax purposes (the Opinion Letter). On that same date, Cadwalader also sent a letter to LaSalle and various rating agencies confirming that those entities could rely on its opinion that the trust was REMIC-qualified. In the Opinion Letter, Cadwalader identifies the categories of documents it relied upon in rendering its opinion, including the PSA, the MLPSA, and the various prospectuses. The Opinion Letter also states that as to any material facts not known to Cadwalader, it relied upon statements and representations made by Nomura. It is undisputed that Cadwalader did not review the appraisal for the Doctors Hospital Loan before rendering its opinion.

In the spring of 2000, Doctors Hospital filed for bankruptcy, and the loan defaulted. On June 1, 2000, the Special Servicer of the securitization gave Nomura written notice that the Doctors Hospital Loan was not REMIC-qualified because it failed the 80% test, and demanded that Nomura repurchase the loan. The Special Servicer noted that the appraisal valued the real property at only $30,960,000, which was substantially less than the requisite $40,000,000.

When Nomura refused to repurchase the loan, LaSalle brought suit in federal court alleging that Nomura had breached the Qualified Mortgage Warranty and the 80% Warranty. The

District Court granted summary judgment to Nomura and dismissed the action (*LaSalle Bank N.A. v Nomura Asset Capital Corp.*, 2004 WL 2072501, 2004 US Dist LEXIS 18599 [SD NY 2004]). On appeal, the Second Circuit modified, stating, inter alia, that issues of fact exist as to whether the Doctors Hospital Loan was secured by at least 80% REMIC real property (424 F3d 195, 208 [2d Cir 2005]). In July 2006, before trial, Nomura settled the federal action for $67.5 million, and repurchased the loan.

Nomura commenced this action asserting that Cadwalader committed legal malpractice, which caused Nomura to settle the federal lawsuit. In the complaint, Nomura alleges that (i) Cadwalader failed to adequately advise Nomura about the applicable REMIC regulations (the advice claim); and (ii) Cadwalader failed to perform the necessary due diligence before issuing its Opinion Letter stating the trust was REMIC-qualified (the due diligence claim).[2] The motion court denied Cadwalader's motion for summary judgment, finding issues of fact as to whether the law firm's advice was deficient, whether the Opinion Letter was issued without sufficient due diligence, and whether Cadwalader's representation of Nomura in the D5 Securitization proximately caused Nomura damages (35 Misc 3d 1222[A], 2012 NY Slip Op 50815[U] [2012]). Cadwalader appeals, and we now modify to dismiss the advice claim and to limit the due diligence claim. Although we do not accept all of Nomura's arguments, we deny summary judgment on the due diligence claim, finding an issue of fact raised by a critical document focused on by the trial court.

To sustain a cause of action for legal malpractice, a plaintiff must show "(1) that the attorney was negligent; (2) that such negligence was a proximate cause of [the] plaintiff's losses; and (3) proof of actual damages" (*Brooks v Lewin*, 21 AD3d 731, 734 [1st Dept 2005], *lv denied* 6 NY3d 713 [2006]). To show negligence, the plaintiff must establish "that the attorney failed to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession" (*Dombrowski v Bulson*, 19 NY3d 347, 350 [2012] [internal quotation marks omitted]). To establish proximate cause, the plaintiff is required to demonstrate that "but for" the attorney's negligence, it "would have prevailed in the underlying matter or

---

**2.** The complaint included several other claims of malpractice, all of which have been withdrawn or dismissed.

would not have sustained any ascertainable damages" (*Brooks v Lewin*, 21 AD3d at 734).

In the advice claim, Nomura alleges that Cadwalader did not advise it of a basic REMIC principle—that the appraisals of the collateral securing the mortgage loans had to separately value the real property, as that term is defined by the REMIC regulations. In its motion for summary judgment, Cadwalader submitted testimony of Charles Adelman and Anna Glick, two of the attorneys who worked on the D5 Securitization. Adelman testified that he advised Nomura that (i) loans in a REMIC-eligible trust must be secured by real property with a value of at least 80% of the loan amount; (ii) real property for REMIC purposes includes land, buildings and permanent structures; (iii) only real property can be considered, and personal property does not count; and (iv) the REMIC 80% test is best proved by an independent third-party appraisal that should separately measure the real property components of the asset.[3] In that regard, Nomura was instructed that an appraisal of REMIC real property should exclude the going-concern value of an operating business. It is undisputed that this is a correct statement of the REMIC rules.

Glick testified that she and Adelman had numerous discussions with Nomura's securitization team about REMIC requirements. She submitted an affidavit stating that before the D5 Securitization closed, Cadwalader provided Nomura with "detailed advice" as to how to satisfy the 80% test. As part of that advice, Glick told Nomura to add together the value of what was plainly REMIC real property, such as land and structural improvements. If that sum amounted to at least 80% of the loan amount, the 80% test would be met. If not, Glick advised Nomura that it should make further inquiries to determine whether the loan met the 80% test. Adelman also advised Nomura that it should consult with Cadwalader if it had any questions about a particular loan.

Perry Gershon, a former vice-president of Nomura who was in charge of the D5 Securitization, confirmed that Cadwalader properly advised Nomura of the REMIC rules. He testified that prior to the D5 Securitization, Cadwalader told him, and he

---

**3.** The dissent incorrectly states that the majority agrees that Cadwalader advised Nomura that it could include, as REMIC real property, the "intangible interests inextricably linked to the real property." Even Cadwalader on appeal does not argue that it provided that specific advice to Nomura, and the record contains no support for the dissent's conclusion that such advice was given.

understood, that a REMIC loan needed to be secured by real property worth at least 80% of the loan, that real property includes land and buildings, but not personal property, and that the appraisals of the collateral securing the mortgage loans in the trust had to separately value the real property.

■ The testimony of Adelman, Glick and Gershon satisfied Cadwalader's prima facie burden on summary judgment showing that the allegedly missing advice was in fact given to Nomura (*see Stolmeier v Fields*, 280 AD2d 342, 343 [1st Dept 2001], *lv denied* 96 NY2d 714 [2001] [rejecting failure to advise claim where the client's own deposition testimony showed he was aware of the advice]). Contrary to the motion court's conclusion, we find nothing inconsistent in Gershon's testimony. Gershon's alleged inability to succinctly articulate the REMIC rules during his deposition, which took place more than 10 years after the advice was given, does not refute his unrebutted testimony that Cadwalader advised him of the relevant rules at the time of the D5 Securitization. Nor does the fact that Gershon is married to one of the Cadwalader attorneys who worked on the transaction, standing alone, raise an issue of fact. At his deposition, Gershon made clear that his wife's employment at Cadwalader had no bearing on how he viewed the litigation. Nomura's current argument to the contrary would only be based on speculation. In any event, even if we were to discount Gershon's statements, the unchallenged testimony of Adelman and Glick shows that the proper REMIC advice was given.

■ Because Cadwalader met its prima facie burden on summary judgment, the burden shifted to Nomura "to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact which require a trial of the action" (*Alvarez v Prospect Hosp.*, 68 NY2d 320, 324 [1986]). Nomura failed to satisfy that burden. It points to no documentary evidence directly refuting the testimony of Adelman, Glick and Gershon that the proper REMIC advice was given. Nor did any witness testify that Cadwalader specifically failed to advise Nomura that the appraisals for the D5 Securitization had to separately value the real property components of the asset in question.

Nomura relies on isolated sections of deposition testimony from some employees suggesting that they may not have been fully familiar with the REMIC rules. For example, Christopher Tokarski, a member of Nomura's securitization team, testified that he was unaware of the 80% test. He claimed to not know

much about appraisals, or that appraisals could include a real property and a personal property component. Nomura points to no evidence, however, that Tokarski's alleged lack of understanding was attributable to anything Cadwalader said to Nomura.

Similarly, Barry Funt, Nomura's former general counsel, appears to have mistakenly believed that the REMIC regulations would always be satisfied if Nomura originated loans in accord with its own underwriting guidelines.[4] But Nomura does not contend on appeal that it requested Cadwalader to review or provide advice about its underwriting guidelines. Moreover, Funt testified that Anna Glick gave him a primer on REMIC rules, and does not challenge her testimony that she advised Nomura properly. Merely because a Nomura employee may have failed to understand certain REMIC principles, does not, absent more, raise an issue of fact as to whether the advice was given in the first place. Funt's testimony, and that of the other Nomura employees, is insufficient to rebut Cadwalader's detailed showing that it advised Nomura of the REMIC rules. Thus, the motion court should have granted summary judgment dismissing the advice claim.

Nomura also alleges that Cadwalader committed malpractice by failing to conduct the necessary due diligence before rendering its opinion that the D5 Trust was REMIC-qualified. In particular, Nomura contends that Cadwalader should have reviewed the underlying appraisals for all of the properties included in the D5 Securitization, and independently confirmed that they were based on real property values that satisfied REMIC requirements. According to Nomura, a review of the appraisal for the Doctors Hospital Loan would have shown a real property valuation of only $30,960,000, approximately $10 million less than the $40 million needed to be REMIC-qualified.

█ Cadwalader maintains that it was not required to review all of the appraisals, and was instead entitled to rely on Nomura's representations in the securitization documents that the 80% test was satisfied. Perry Gershon testified that the scope of Cadwalader's duties did not include review of the appraisals, and that the REMIC opinion was to be based on information

---

4. Nomura's underwriting guidelines required an LTV ratio of less than 80%. Since, to be REMIC qualified, a loan must have an LTV ratio of less than 125%, complying with the underwriting guidelines would often result in loans satisfying the REMIC 80% test. However, that is not true in all cases because the value of a property for underwriting purposes may not be the same as the value of the property for REMIC purposes.

provided to Cadwalader by Nomura. Gershon explained that Nomura did not ask or expect Cadwalader to review the appraisals, and he specifically told Cadwalader not to independently verify the accuracy of Nomura's representations unless specifically requested. Barry Funt confirmed that understanding, testifying that he never directed Cadwalader to review the appraisals, and did not expect Cadwalader to look at every one of them. Moreover, in light of Nomura's sophistication in the securitization field, and its knowledge of the REMIC rules, Cadwalader cannot be faulted for not undertaking a de novo review of all of the appraisals to determine REMIC-eligibility.

Cadwalader also submitted affidavits from experts in the CMBS and REMIC fields opining that Cadwalader followed the accepted practice of CMBS attorneys in relying on Nomura's representations and not reviewing all of the appraisals. For example, Michael Weinberger, a partner at Cleary Gottlieb Steen & Hamilton LLP who practices in the CMBS field, stated that customarily it is the role of the client, not securitization counsel, to examine the appraisals of the collateral securing the loans. James M. Peaslee, a REMIC expert at Cleary Gottlieb, agreed, stating that it is not standard practice for securitization counsel to look at appraisals absent a specific request from the client. Based on these opinions, along with the fact that Nomura specifically requested Cadwalader not to review the appraisals, we conclude that Cadwalader had no generalized duty to review the underlying appraisals for all of the loans in the securitization.

The opinion rendered by Nomura's expert, Arthur Norman Field, does not raise an issue of fact as to whether Cadwalader should have reviewed all of the appraisals. Field opines on the general practice of rendering closing opinions, but has no expertise in REMIC issues. He has never practiced in the securitization or REMIC fields, has never advised a client on REMIC matters, and has never studied the standards governing tax attorneys with respect to REMIC opinions. Nor does Field sufficiently address one of the most critical facts here—that Nomura specifically instructed Cadwalader to not review the appraisals.

Although we reject Nomura's due diligence claim to the extent it asserts that Cadwalader had a generalized duty to review all of the appraisals, that does not end the inquiry. Adelman testified that reviewing an appraisal would be appropriate if Cadwalader received any information that would have caused it to

question whether the loan satisfied the 80% test. James M. Peaslee, one of Cadwalader's experts, agreed, stating that securitization counsel should not simply rely on a client's representations if it saw something inconsistent with them. Even the dissent concedes that if Cadwalader received information that would call into question the REMIC-eligibility of one of the loans, it had the duty to make further inquiry and raise the issue with Nomura. Thus, both Cadwalader and the dissent acknowledge that if "red flags" are raised about a client's representations, further inquiry would be warranted.

■ We cannot conclude as a matter of law that no such "red flags" were raised. On September 30, 1997, several weeks before Cadwalader issued its Opinion Letter, Nomura faxed Cadwalader a document describing the "Deal Highlights" of the Doctors Hospital Loan. The fax cover sheet indicates that the document was sent directly to Lisa Post-Gershon, one of the Cadwalader attorneys working on the transaction. The fax headers show that only a single 39-page document was transmitted. Thus, the document was sent alone, and was not part of some larger document production.

Viewing the evidence in the light most favorable to Nomura, we find that a jury could reasonably conclude that the "Deal Highlights" document, on its face, contains warning signs that the Doctors Hospital Loan may not have qualified for REMIC treatment. Although one section of the document shows an appraised value of $68,000,000, which, at first glance, suggests that the loan would be REMIC-eligible, the totality of the other information contained therein raises questions as to whether the $68,000,000 figure constituted only REMIC real property.

On the very first page, the document describes the loan as being "secured by the land, building, and *operations* of the property known as Doctor's Hospital" (emphasis added). It also identifies the collateral as "[t]he land, building and property management (*operations*)" of the hospital (emphasis added). According to the advice given to Nomura by Cadwalader, real property for REMIC purposes includes land, buildings and permanent structures. Critically, Cadwalader also advised Nomura that, for REMIC purposes, it should exclude the going-concern value of an operating business. Thus, the fact that the loan was secured by "operations" could reasonably be viewed as an indication that Nomura had obtained an appraisal that included non-REMIC-qualified property. At the very least, the document made clear that Nomura's valuation figure was based on items other than land, buildings and structures.

That the $68,000,000 figure might include a substantial amount of non-REMIC-eligible property becomes clearer in subsequent pages of the "Deal Highlights" document. The section titled "Appraised Value" sets forth a $40,600,000 alternate valuation based on the cost approach, which focuses not on operations, but on the land, buildings and improvements, and equipment. As noted by the motion court, this amount is dangerously close to the $40,000,000 needed for REMIC eligibility, and thus raises questions as to whether the loan should have been included in the securitization.

Indeed, Adelman conceded that he would typically inquire further if a valuation came close to REMIC-eligibility, and that his practice was to request the underlying appraisal if he believed further inquiry was required. It is undisputed that Cadwalader made no further inquiry and did not request the appraisal. The dissent ignores Adelman's testimony on this point, and provides no persuasive reason to support its conclusion that the $40,600,000 appraisal figure does not constitute a "red flag" as a matter of law. Instead, the dissent points to the alternate $68,000,000 valuation contained in the document to argue that no warning signs were present. But the dissent cannot escape the fact that the Deal Highlights document also contains the $40,600,000 figure, a potential "red flag" apparent from the face of the document itself.

The dissent argues that no unusual scrutiny needed to be given to the Doctors Hospital Loan because other loans in the securitization were also income-producing going-concern businesses.[5] But a potential "red flag" exists not solely based on the going-concern status of the Doctors Hospital but because the Deal Highlights document indicates that the loan was secured, in part, by "operations," suggesting that some of the loan collateral was not REMIC-qualified. In any event, that the Doctors Hospital was partially secured by "operations" is not the only

---

**5.** The dissent points to certain statements made by Nomura's REMIC expert about "occupied" and "unoccupied" properties, and "intangible elements" of property value that are "inextricably linked" to the real property, to support its conclusion that there was nothing unusual, based on the information Cadwalader received, about the Doctors Hospital Loan. Although there is no dispute about what the expert said, we disagree that there was nothing unusual about this loan. The dissent fails to appreciate that the Deal Highlights document showed that Nomura's appraised value may have included non-REMIC real property and contained an alternate valuation that brought it perilously close to the REMIC threshold. It is this information that sets the Doctors Hospital Loan apart from the other loans in the securitization.

basis for our conclusion that further inquiry into the loan may have been warranted. Moreover, the dissent's focus on other loans in the securitization misses the mark. The question here is not, as the dissent frames it, whether the Doctors Hospital Loan was different from the other loans. Rather, the proper inquiry is whether Cadwalader has met its burden of establishing, as a matter of law, that the Deal Highlights document contained no "red flags" to suggest that the loan was not REMIC-qualified. We find that Cadwalader has not satisfied its burden.

Relying on testimony from Anna Glick, the dissent excuses Cadwalader's inaction by suggesting that Nomura, which had in its possession the underlying appraisal, should itself have raised any potential REMIC issues with Cadwalader. The dissent's conclusion that Cadwalader should be allowed to escape liability due to "Nomura's own oversight" is inconsistent with the dissent's acknowledgment that Cadwalader could not ignore warning signs in the Deal Highlights document if it saw any. It also ignores the testimony of Cadwalader's lead partner Charles Adelman, and its expert James M. Peaslee, that a lawyer cannot blindly rely on a client's representations if the lawyer sees something inconsistent with them. By shifting the blame here to Nomura alone, the dissent, in effect, is proposing that a law firm that has a knowledgeable client should, as a matter of law, be excused from its document review obligations.

The dissent's recitation of Adelman's testimony is misleading. Although Adelman testified that no "red flag" was presented with respect to the Doctors Hospital Loan, he was not talking about the "Deal Highlights" document. In fact, Cadwalader points to no evidence that Adelman, or anyone at Cadwalader, even read the document. Despite having been given the opportunity by the motion court to specifically address the document, Cadwalader failed to submit an affidavit from Adelman, or any of Cadwalader's lawyers. Thus, it is unknown whether Cadwalader read the document and overlooked the potential "red flags," interpreted all of the information therein to be consistent with the REMIC rules, or merely filed it away. Nor did Cadwalader, in its submissions to the motion court, address the fact that the document referenced the $40,600,000 cost-approach valuation that came dangerously close to the REMIC threshold.

If Cadwalader did not fully analyze the "Deal Highlights" document, there may be a reason for this decision. But the record before us sheds little light on the central question of what

happened after the document was faxed to Cadwalader. In light of Cadwalader's role as securitization counsel, a jury might reasonably conclude that Cadwalader should have read a document separately sent by its client relating to one of the largest loans in the securitization, and then made a follow-up inquiry about the Doctors Hospital Loan.

Having no convincing response to the significance of the "Deal Highlights" document, the dissent resorts to chastising the majority for addressing the document at all. In the dissent's view, because Nomura's appellate brief did not discuss the document at length, we should essentially ignore it.[6] The dissent overlooks the fact that, although not the primary focus of Nomura's brief, the "Deal Highlights" document was critical to the motion court's conclusion that issues of fact exist as to whether Cadwalader ignored "red flags." It is the role of this Court to address not only arguments made in appellate briefs, but also to review the conclusions and reasoning of the lower courts.

It is not surprising that Nomura did not rely solely on this document, because its main appellate argument, which we reject, was that Cadwalader had a duty to review all of the underlying appraisals, regardless of any "red flags." Although Nomura hoped to prevail on a broader theory, which could have made it much easier for them to prevail at trial, we uphold the due diligence claim on a more limited basis. The dissent fails to recognize that the majority is doing what courts routinely do on summary judgment motions—narrowing the issues for trial. The dissent apparently believes that because the majority rejects Nomura's claim that Cadwalader had a generalized duty to review all of the appraisals, we should ignore altogether the portion of the motion court's decision that addressed the "Deal Highlights" document. Ultimately, it is for the trier of fact, not this Court, to decide whether Cadwalader met its duty of care upon receipt of the document, taking into account the potential problems it showed and the overall expertise of the client.

■ Cadwalader's reliance on the Opinion Letter to escape all liability is unavailing. The letter states that Cadwalader was relying on Nomura's representations as to "facts material to [the opinion that] were not known to [Cadwalader]." It further

---

6. The dissent places undue emphasis on the extent to which the "Deal Highlights" document was mentioned by the parties at oral argument. In any event, there can be no dispute that the document was the subject of questioning by the bench. Moreover, given the inevitable time constraints, no conclusion can or should be drawn from what is covered in oral argument.

makes clear that Cadwalader's "knowledge" means "actual awareness . . . of . . . information by any lawyer in our firm actively involved in the [D5 Securitization]." Since there are questions of fact as to the circumstances under which Cadwalader received the "Deal Highlights" document, and what Cadwalader knew about the Doctors Hospital valuation, it cannot be said as a matter of law that the disclaimers in the Opinion Letter insulate Cadwalader from the malpractice alleged.[7]

■ Finally, Cadwalader argues that Nomura cannot establish proximate cause because the Doctors Hospital Loan was in fact REMIC-qualified. Cadwalader contends that the loan was secured by the requisite 80% REMIC real property, and that Nomura made formal judicial admissions of that alleged fact in the federal action. These contentions lack merit. In the appraisal obtained before the securitization closed, the only readily apparent REMIC real property amounts to only $30,960,000, which is plainly less than the required $40,000,000. Although a subsequent appraisal obtained after the deal closed indicates that the loan was REMIC-qualified, that merely presents a question of fact for a jury.

■ There is no merit to Cadwalader's contention that Nomura made formal judicial admissions that the loan qualified for REMIC treatment. Cadwalader points to only two alleged admissions made in the federal action. First, during an oral argument, Nomura's counsel stated that the appraisal evidences that the loan was secured by sufficient REMIC real property. Second, a point heading in one of Nomura's memoranda of law states that the fair market value of the interest in real property with respect to the Doctors Hospital Loan was at least 80% of the amount of the loan. These statements constitute, at most, informal judicial admissions that provide some evidence of the facts admitted, but that are not conclusively binding on Nomura (see Baje Realty Corp. v Cutler, 32 AD3d 307, 310 [1st Dept 2006]). They lack the formality required to constitute formal judicial admissions (see GJF Constr., Inc. v Sirius Am. Ins. Co., 89 AD3d 622, 626 [1st Dept 2011, Richter, J., concur-

---

7. Cadwalader unpersuasively argues that the due diligence claim should be dismissed on standing grounds because the Opinion Letter was not addressed to Nomura. The Opinion Letter was issued on behalf of Nomura, who was Cadwalader's client at the time. Furthermore, Nomura alleges that it suffered injury as a result of the lack of Cadwalader's due diligence before rendering the opinion.

ring]). We have considered Cadwalader's remaining arguments on causation and find them unavailing.

In concluding that the malpractice cause of action against Cadwalader should be dismissed in its entirety, the dissent misperceives that the majority is reaching out to create an issue of fact. We emphatically reject this contention, and it does not become true simply because the dissent continually repeats it. As noted, the motion court, in its decision, addressed the significance of the Deal Highlights document in denying Cadwalader's motion for summary judgment. In light of the motion court's reliance upon this critical document, it is disingenuous for the dissent to accuse the majority of creating fact issues for trial. In upholding Nomura's malpractice claim on a narrow basis, we fully adhere to our role of "issue-finding, rather than issue-determination" (*Vega v Restani Constr. Corp.*, 18 NY3d 499, 505 [2012] [internal quotation marks omitted]).

Accordingly, the order of the Supreme Court, New York County (Melvin L. Schweitzer, J.), entered on or about January 13, 2012, which denied defendant's motion for summary judgment dismissing the first cause of action, should be modified, on the law, to grant the motion with respect to that part of the cause of action alleging that defendant failed to properly advise plaintiffs, and otherwise affirmed, without costs.

FRIEDMAN, J.P. (dissenting in part). The majority opinion is something of an anomaly. Although it affirms the denial of the motion by the defendant law firm, Cadwalader, Wickersham & Taft, LLP (Cadwalader), for summary judgment dismissing a cause of action for malpractice, the majority rejects—correctly, in my view—each of the appellate arguments made by Cadwalader's former clients, plaintiffs Nomura Asset Capital Corporation and an affiliated entity (collectively, Nomura), for the existence of a triable issue as to whether Cadwalader committed malpractice in advising Nomura on the subject transaction, a securitization of 156 commercial loans that closed in 1997. Thus, the majority explains in detail the record facts that lead it to conclude, as a matter of law, that Cadwalader provided Nomura with proper legal advice and (by Nomura's own choice) was not generally responsible for conducting due diligence for the transaction. Nonetheless, the majority finds that the matter must be sent to trial based solely on one document setting forth the "Deal Highlights" of one of the 156 securitized loans—a document that Nomura did not include among the more than 1,200 exhibits it submitted with its original opposition to the

summary judgment motion, that Nomura did not show to either of the two experts it retained to opine on the applicable standard of care (whose respective reports therefore do not refer to it), that Nomura barely touched upon in its appellate brief, and that neither side mentioned at its own instance at oral argument before us.[1]

I cannot fault the parties for having failed to anticipate the epochal significance with which the majority invests the Deal Highlights document. As more fully discussed below, that document has nothing in it to indicate that the loan with which it deals was more likely to be inappropriate, under the applicable body of law, for inclusion in the securitization than any of the other 155 loans with which it was being securitized. While there is indeed a document in the record that arguably should have alerted an attentive professional to the possible existence of a problem with the loan, that document—an appraisal of the property securing the loan—was not provided to Cadwalader before the securitization closed because Nomura had not retained Cadwalader to review appraisals of the properties that secured the loans.[2] In my view, therefore, Cadwalader is entitled to summary judgment dismissing Nomura's legal malpractice claim in its entirety.

According to the majority, the Deal Highlights document, which Nomura faxed to Cadwalader about three weeks before

---

1. The Deal Highlights document is part of the record only because the motion court, having seen it briefly discussed in the transcript of the deposition of one fact witness, asked the parties to submit a copy of it while the summary judgment motion was sub judice. Thus, in their original submissions on the motion, neither side thought the Deal Highlights document—to which the majority ascribes outcome-determinative significance—to be of sufficient importance to warrant inclusion in the record. While it is true, as the majority states, that the Deal Highlights document was "the subject of questioning by the bench" at the argument of this appeal, the fact is that this "questioning" consisted of only one question that made reference to the document, and counsel—understandably, in a case involving such an extensive record—answered the question under the misapprehension that the justice was referring to a different document, namely, the prospectus for the securitization. This misunderstanding—which, regrettably, was not corrected—again highlights that the parties themselves have attached no significance to the document.

2. The former Nomura executive who had been in charge of the subject securitization, Perry Gershon, was asked the following question at his deposition in this matter: "Nomura did not ask, expect or want Cadwalader to review the appraisals underlying the property securing the loans in the [securitization]; correct?" To this question, Gershon responded: "Correct." As the majority correctly holds, Cadwalader had no general obligation to conduct due diligence that its client did not want it to perform.

the closing, was a "red flag" that should have alerted Cadwalader to the possibility that the loan it described (hereinafter, the Doctors Hospital loan) might disqualify the securitization for favorable tax treatment as a real estate mortgage investment conduit (REMIC). In summary, to qualify for inclusion in a REMIC securitization under federal tax law, the $50 million Doctors Hospital loan (which had been made to an operating acute-care hospital of that name) was required to be secured by real property with a value of at least $40 million when all elements of personal property were excluded from the appraisal, so that the ratio of the value of the secured real property to the value of the loan (the VTL ratio) would be at least 80%. The majority reasons that the Deal Highlights document was a red flag because, although it stated that the value of the hospital securing the loan was $68 million (a figure that would yield a VTL ratio of 136%, far more than the required 80%), the document also stated that the valued loan collateral included, in addition to the land and building, the hospital's operations as a going concern, with no breakout of the value of the real property alone.

If I agreed with the majority that, on this record, the information in the Deal Highlights document could reasonably be found to constitute a "red flag" that should have prompted Cadwalader to make further inquiry, I would join in affirming the denial of summary judgment. After all, even while they took the position (with which the majority agrees) that Cadwalader was not responsible for conducting due diligence, Cadwalader's expert witnesses and its senior REMIC partner, Charles Adelman, Esq., agreed in their testimony that it would have been appropriate for the firm to raise an issue with Nomura if any information came to Cadwalader's attention that reasonably put in question the qualification of any of the loans for REMIC treatment. Nothing in the record, however, supports the majority's conclusion—a conclusion that Nomura itself has not asked us to draw—that the Deal Highlights document, merely because it stated that the appraisal included the hospital's value as a going concern, should have alerted Cadwalader to a potential problem with the loan, given that Cadwalader had already properly advised the client about the REMIC rules (as determined by the majority). To reiterate, if there was any red flag in this case, it was a document that Nomura, but not Cadwalader, had in its possession when the securitization closed, namely, the August 1997 appraisal of the hospital, which had

been prepared as the basis for the underwriting of the Doctors Hospital loan.[3]

At this point, it is useful to recapitulate what the record establishes, as the majority and I for the most part agree, about the advice Cadwalader gave Nomura about the REMIC rules. Cadwalader properly advised Nomura: (1) that, for the securitization to qualify for REMIC tax treatment, each loan was required to have a VTL ratio of at least 80%; and (2) that, in determining a loan's VTL ratio, only the value of the mortgaged real property itself (meaning the land, its structural improvements and intangible interests inextricably linked to the real property) could be considered, while the value of any personal property (tangible or intangible) deemed by the Internal Revenue Service to be separable from the real property had to be excluded.[4] In view of the complexity of determining which intangible interests and physical personal property could be included in the real-property value figure, Cadwalader advised Nomura to ascertain, at the outset, a value for assets that were "plainly real property (such as land and structural improvements, or 'sticks and bricks')" and then to "inquire further" if those items alone did not meet the REMIC 80% threshold.[5]

---

**3.** Cadwalader did not represent Nomura in the origination of the Doctor's Hospital loan.

**4.** Nomura's REMIC expert, Thomas J. Biafore, Esq., agreed that intangible interests "inextricably linked" to the real property could be included in the value of the real property for REMIC purposes, so this point is uncontroverted. Whether or not the majority wishes to acknowledge the point that some intangible interests may be included in a real property valuation for REMIC purposes is irrelevant, as even Nomura's REMIC expert agrees that this is the case. Moreover, the majority mischaracterizes my position on the advice Cadwalader gave Nomura about how to choose loans for a REMIC, as established by the record. As described in the sentences in the text immediately following this footnote, and in footnote 5, the record establishes that Cadwalader advised Nomura that ("to be prudent," as stated in Cadwalader's letter to the motion court addressing the Deal Highlights document) it should exclude personal property and intangible interests of any kind (whether or not "inextricably linked" to real estate) from the valuation of mortgaged real property in conducting its own due diligence on loans being considered for REMIC securitization. As discussed more fully below, the record establishes that Nomura failed to do this in the case of the Doctors Hospital loan and, before the closing, Cadwalader had no information in its possession to indicate that such a failure had occurred.

**5.** Cadwalader partner Anna Glick states in her affidavit:
"Prior to the [securitization's] closing, Cadwalader provided detailed advice to Nomura regarding how to satisfy the 80% Test. As part of that advice, a rule of thumb communicated by Cadwalader to Nomura was that the value of what was plainly real

It is undisputed that Nomura, having been advised as described above, did not raise any question with Cadwalader about the Doctors Hospital loan's REMIC eligibility while the securitization was being put together. Rather, Nomura provided Cadwalader with the bottom-line, $68 million income-based valuation the appraiser had placed on the hospital, a figure that appeared in a table of financial data on each loan that was to be appended as a supplement to the securitization prospectus, as well as in the Deal Highlights document. The $68 million valuation was not broken down into different components in the prospectus supplement (just as it was not in the Deal Highlights document), but this was no different than the information provided to Cadwalader for any of the other loans. In each case, Cadwalader was given a bottom-line valuation figure for the property securing the loan.

Further, that Doctors Hospital was an operating, income-producing business did not serve to distinguish it from the properties securing any of the other loans. Contrary to the majority's unfounded implication that the other loans may have been secured by property that did not produce income (such as raw land, empty buildings or owner-occupied homes), Mr. Adelman, Cadwalader's senior REMIC partner, testified without contradiction that loans included in REMICs are invariably secured by income-producing properties:

> "All of the loans in a REMIC, to one degree or another, are income generating properties. They all are. There is no raw land in a REMIC. So, to that extent, one commercial property is much like another in terms of its analysis, in terms of its cash flow, its debt service coverage."

Thus, there is no warrant for the portentous significance the majority ascribes to the statement in the Deal Highlights document that the loan collateral included the hospital's "land, building and operations"; the same was true of every other loan in the securitization. Stated otherwise, while it is true that the inclusion of "operations" in the collateral of the Doctors

---

property (such as land and structural improvements, or 'sticks and bricks'), should be added up by Nomura to see if it amounted to at least 80% of the loan amount. If those items alone satisfied the 80% Test (and they usually did), then the 80% Test would be satisfied. If not, then Nomura needed to inquire further to determine whether the loan met the 80% Test."

Ms. Glick's testimony on this point, which she reiterated at her deposition, is uncontroverted.

Hospital loan meant that less than 100% of the mortgaged property's value constituted REMIC-qualified real estate, the same could be said of every one of the 156 loans.

To understand why each of the loans in the securitization was secured by property that included both REMIC-qualified and non-REMIC-qualified elements of value, it should be borne in mind that, as acknowledged by Mr. Biafore, Nomura's REMIC expert, an occupied (or "stabilized") property will have a higher value than it would if it were unoccupied (or "dark"). Hence, the value of a stabilized property (which all of the relevant properties were) necessarily includes intangible elements of going-concern value. As previously discussed, those intangible elements of value are includable in the value of the real property for REMIC purposes only to the extent they are "inextricably linked" to the real property. Thus, in the case of *any* mortgaged stabilized property, "some of the loan collateral [will] not [be] REMIC-qualified," to paraphrase language used by the majority. The question is always whether enough of the value is REMIC-qualified to reach the required 80% VTL ratio. Based on the information Nomura provided to Cadwalader, there was nothing unusual about Doctors Hospital in this regard.

I reject the majority's assertion that I "fail[ ] to appreciate" the significance of the Deal Highlights document's supposed revelation that the hospital's appraised value "may have included non-REMIC real property." To reiterate, since each of the 156 loans was secured by an occupied, income-producing property, the appraised value of each of those properties—not Doctors Hospital alone—included elements of value that were not REMIC-qualified. Thus, the majority is simply incorrect in stating that this issue somehow "sets the Doctors Hospital Loan apart from the other loans in the securitization."[6]

In glibly stating that "[t]he question here is not . . . whether the Doctors Hospital Loan was different from the other loans," the majority elides the question that emphatically is the subject of this appeal. To reiterate, that question is whether, on this record, Cadwalader had any information about the Doctors Hospital loan that placed its REMIC-qualification in question to

---

**6.** As to the "alternate valuation" of Doctors Hospital set forth in the Deal Highlights document, while I address that point more fully at a later point in this opinion, here it will suffice to say that, as reflected in the Deal Highlights document, Nomura's appraiser concluded that the appropriate appraisal methodology was the one that yielded a value of $68 million, which was far from "perilously close" to the $40 million figure required for REMIC purposes.

a greater degree than any of the other 155 loans. If not, the implication of the majority's position is—in spite of the portions of its opinion that appear to indicate otherwise—that Cadwalader was obligated to conduct due diligence concerning the REMIC-qualification of each of the 156 loans, notwithstanding Nomura's decision not to retain the law firm for that purpose.

Mr. Adelman also testified that he reviewed the property valuations that Nomura had provided to him to satisfy himself that none of the loans raised an apparent REMIC problem. While he acknowledged that the valuation figures provided to him were not broken down into real-property and non-real-property elements, Mr. Adelman stated that, based on his experience, he made a judgment as to whether each total valuation figure was likely to include sufficient REMIC-qualified real property to meet the 80% threshold. He testified that, in his experience, it would have been extremely unlikely for real property to account for less than $40 million of the $68 million total valuation the appraiser had placed on Doctors Hospital.[7] Mr. Adelman testified that, based on his assessment of the high likelihood that the appraised value of the hospital included at least $40 million of real property value, and in view of his knowledge that Nomura, which had chosen to do its own due diligence for this transaction, had been properly advised of the REMIC requirements, he thought it unnecessary to inquire further about the Doctors Hospital loan.[8] Notably, when the motion court invited

---

**7.** Again, the hospital's real property value had to be at least $40 million to comply with the REMIC requirement that the value of the mortgaged real property be at least 80% of the value of the $50 million loan.

**8.** Mr. Adelman testified as follows:

"I formed a judgment that a loan [sic] was valued at $68 million. Even in my experience and judgment, even if it consisted of a significant part of some personal property as well as real property, that it was—would not have been consistent with high [sic] experience that the real property portion was less than $40 million or putting it another way, it was not apparent on its face that someone, anyone who was involved in the valuation process, in the due diligence process or at Nomura did not do their job.

"No red flag was raised that this loan might have had an unusual amount of personal property, so that no red flag raised that caused me to inquire further."

Shortly thereafter, he further testified:

"It was my judgment that the ratio between personal property and real property on a loan of $50 million supported by an aggre-

Cadwalader to comment on the Deal Highlights document, defense counsel submitted a letter drawing attention to this testimony by Mr. Adelman, as well as to the aforementioned testimony by Ms. Glick, among other evidence, to establish that nothing in the document gave Cadwalader any reason to question Nomura's representation that the Doctors Hospital loan met the threshold 80% VTL ratio. Neither Nomura nor the majority points to any contrary testimony in the record.[9]

What Cadwalader did not, but Nomura did, have in its possession at the time of the securitization, was the actual August 1997 appraisal of Doctors Hospital that had served as the basis for the underwriting of the loan. That appraisal, unlike the Deal Highlights document, breaks down the $68 million valuation figure into the following components:

"Allocation of Value

| | |
|---|---|
| Land | $ 3,000,000 |
| Building and Site Improvements | 27,960,000 |
| Equipment | 9,640,000 |
| Intangibles | 27,400,000 |
| Total | $68,000,000" |

On its face, this appraisal values the "sticks and bricks" to which Ms. Glick referred at only $30,960,000. According to Ms. Glick's uncontradicted testimony, because this figure was less than 80% of the loan value, it should have prompted Nomura, based on the advice Cadwalader had given it (as found by the

gate valuation of [$]68 million would have been. It would have been highly unusual for it to have resulted in a real property value of less than $40 million for a going business in a particular building and location."

**9.** While it is true, as the majority states, that "it is unknown whether Cadwalader read the [Deal Highlights] document" or, if anyone at the firm did read the document, how that person interpreted it, I fail to see why this makes any difference to the outcome of this appeal. Neither do I see why the majority considers it significant that Cadwalader did not submit an affidavit from one of its attorneys concerning what the firm did with the document after receiving it. Since it is undisputed that Cadwalader received the document about three weeks before the closing, if there really were a red flag in the document, Cadwalader could not defend itself on the ground that nobody in the office actually read it. My view, however, is that the document contained no red flag, as a matter of law. Again, I find it remarkable that the majority apparently sees nothing odd in the fact that the able counsel for each side, in the extensive discovery that has been conducted in this action, did not expend more effort to ascertain what Cadwalader did with the Deal Highlights document after receiving it. It appears that the majority perceives a significance in this document that has been invisible to the parties and their counsel up to this point in the litigation.

majority), to ask Cadwalader to undertake a further analysis to determine whether the Doctors Hospital loan qualified for inclusion in a REMIC securitization.[10] Arguably, if this appraisal had been in Cadwalader's possession at the time of the securitization, there would be a triable issue of fact as to whether the applicable standard of care required Cadwalader to make further inquiry to determine whether the Doctors Hospital loan in fact had a REMIC-qualifying VTL ratio. It is undisputed, however, that Nomura never gave anyone at Cadwalader a copy of the appraisal up to the time of the closing, and nothing in the record supports an inference that the firm had any reason to ask to see the appraisal. Nonetheless, the majority decides this appeal as if Cadwalader had the appraisal in hand when the securitization closed.

The majority fails to come to grips with the lack of any information in the Deal Highlights document that might have materially distinguished the Doctors Hospital loan from the other loans being packaged in the securitization. As previously stated, each of the 156 loans was secured by a property that was the site of an income-producing, going-concern business; and, in any event, Cadwalader was aware of the general nature of the Doctors Hospital property independent of the Deal Highlights document. Contrary to the majority's assertion that it is somehow "misleading" for me to rely on Mr. Adelman's testimony about the absence of any "red flag" because "he was not talking about the 'Deal Highlights' document," I make no implication that the quoted testimony refers to that document (which apparently was not shown to the witness). Mr. Adelman's uncontradicted testimony is nonetheless fatal to Nomura's claim, however, because what the witness was discussing is the very same information that the majority finds so damning when set forth in the Deal Highlights document—that the property securing the loan was an operating, income-producing hospital, the

---

**10.** That the appraisal valued the land and building, by themselves, at less than $40 million does not necessarily mean that the loan was not REMIC-qualified. As previously discussed, intangible values "inextricably intertwined" with the real property, and equipment that would be deemed to qualify as fixtures under the REMIC rules, would be included in the value of the real property for purposes of determining whether the requisite 80% VTL ratio was satisfied. Indeed, Nomura argued in subsequent litigation that a sufficient amount of the value the appraiser attributed to "Equipment" and "Intangibles" could be allocated to real property to reach the 80% VTL ratio threshold. However, the extent to which the intangibles and equipment included in Doctors Hospital's valuation were classifiable as real property for REMIC purposes could not be determined from the face of the appraisal upon which the loan was underwritten.

going-concern value of which was part of the security for the loan. Mr. Adelman, whether or not he or anyone else at Cadwalader read the Deal Highlights document, was well aware of this information, and, as previously discussed, he explained, under oath, why it did not constitute a red flag. This explanation is not contradicted anywhere in the record.[11]

Notably, Nomura's theory, as articulated by its REMIC expert, Mr. Biafore, and its expert on the standard of care for the preparation of legal opinion letters, Arthur Norman Field, Esq. (neither of whom ever saw the Deal Highlights document), is that Cadwalader was obligated to review the appraisal report for the property securing each loan (although Nomura had instructed it not to do so) and would have been alerted to a problem with the Doctors Hospital loan from the appraisal of that property. While the Doctors Hospital appraisal report, unlike the Deal Highlights document, contained a breakdown of the bottom-line $68 million valuation figure into its different elements—and I agree that the appraisal's valuation breakdown arguably would have constituted the proverbial "red flag," given that it attributed only $30.96 million of the property's value to elements that plainly qualified as real property for REMIC purposes—Nomura chose not to provide the appraisal report to Cadwalader. To reiterate, the majority specifically rejects Nomura's theory that Cadwalader, notwithstanding Nomura's exclusion of due diligence from the scope of its retention, was obligated to review each appraisal report even in the absence of any indication of a potential problem with a particular loan. As previously discussed, none of the information about Doctors Hospital that Nomura provided to Cadwalader, including the information set forth in the Deal Highlights document, gave an indication of a possible REMIC problem with the Doctors Hospital loan.

The majority also fails to come to grips with Ms. Glick's uncontradicted testimony that she advised Nomura to alert Cadwalader if the stand-alone value of the land and building ("sticks and bricks") of the property securing any loan did not equal at

---

**11.** It is true, as the majority notes that Mr. Adelman and one of Cadwalader's legal experts conceded, that "a lawyer cannot blindly rely on a client's representations if the lawyer sees something inconsistent with them." The majority fails, however, to identify anything in the information Nomura provided to Cadwalader before the closing of the securitization that was inconsistent with Nomura's representation that the Doctors Hospital loan met the 80% REMIC threshold. As more fully discussed below, an alternative valuation of the property referenced in the Deal Highlights document does not change this conclusion.

least 80% of the amount of the loan. This advice, combined with the breakdown of the valuation of Doctors Hospital in the appraisal report (which valued the land, building and site improvements at only $30.96 million)—a valuation breakdown that Cadwalader never saw before the closing, because Nomura chose not to provide it with the appraisal report—should have prompted Nomura to bring the loan to Cadwalader's attention and to ask it to undertake further analysis to determine whether the loan was, in fact, suitable for inclusion in a REMIC. Given that Nomura, for reasons of its own, chose not to have Cadwalader conduct general due diligence, Nomura should not be permitted to hold Cadwalader liable for what was Nomura's own oversight, in spite of its having received advice sufficient to allow it to spot the issue when conducting its own due diligence.

The majority asserts that my view that Nomura should not be allowed to hold Cadwalader liable for Nomura's own oversight is "inconsistent with the dissent's acknowledgment that Cadwalader could not ignore warning signs in the Deal Highlights document if it saw any." There is no inconsistency in my views. Again, the majority is ignoring the fact that Nomura's oversight was in overlooking a "warning sign[ ]"—the breakdown of the valuation into its different elements—that was present in the appraisal report, which Nomura chose not to provide to Cadwalader, but was *not* present in the Deal Highlights document or any other document with which Cadwalader had been provided. And, to reiterate, Ms. Glick's uncontradicted testimony establishes that Cadwalader's advice to Nomura should have sufficed to enable the sophisticated finance professionals at Nomura to perceive the "warning sign[ ]" in the appraisal report. In sum, Nomura, having been duly advised by Cadwalader of what to look for in choosing loans for inclusion in the securitization, chose to perform its own due diligence. This being the case, Nomura should not be allowed to recover from Cadwalader for a loss that was caused by Nomura's own negligence in performing that due diligence—negligence that consisted in overlooking a warning sign in a document that Nomura had chosen not to provide to Cadwalader.

The majority makes much of the fact that the Deal Highlights document mentioned that one of two alternative methodologies for appraising Doctors Hospital, the cost approach, yielded a value of $40.6 million, which was just above the $40 million figure the value of the real estate had to reach to satisfy the

80% REMIC threshold.[12] However, the Deal Highlights document stated that the ultimate "appraised value" of Doctors Hospital was the $68 million figure yielded by the capitalized income approach, reflecting the professional appraiser's conclusion that the income approach, rather than either of the two alternatives, was the appropriate methodology.[13] This was consistent with the uncontradicted testimony of Mr. Gershon, the former Nomura executive who supervised the securitization, to the effect that "[i]t is the income approach as opposed to the cost approach that's generally indicative of the value of an asset, particularly for REMIC purposes." Notably, Mr. Biafore, Nomura's REMIC expert, quoted this testimony in his affidavit, and did not express any disagreement with it. Further, as previously discussed, Mr. Adelman explained that, in his judgment, there was no need for further inquiry about the Doctors Hospital loan because, in his experience, there was a very high likelihood that a $68 million appraisal figure for a property would include at least $40 million of real property value within the meaning of REMIC.

The majority accuses me of "ignor[ing]" Mr. Adelman's testimony that it was his practice to make further inquiry if the valuation figure given to him by a client came close to the 80% minimum VTL ratio required by the REMIC rules. While I of course acknowledge this testimony, it does not change the fact that the operative valuation figure for Doctors Hospital that Nomura provided to Cadwalader—based on the advice of the professional appraiser Nomura had retained—was $68 million, far above the minimum $40 million real-estate valuation that was needed for REMIC purposes. The majority identifies nothing in the record to put in question the view of Nomura's appraiser that the relevant appraisal methodology was the income approach that yielded the $68 million valuation. Again, even Nomura's REMIC expert raised no objection to this view when he quoted Mr. Gershon's testimony expressing it. Indeed, not even Nomura itself, when asked by the motion court to address the Deal Highlights document, made any argument that the alternative $40.6 million "cost" valuation rejected by the appraiser was a "red flag" indicating a potential REMIC problem.

12. Although not mentioned by the majority, the Deal Highlights document states that the other alternative appraisal methodology, the comparable sales approach, yielded a value figure of $64 million.

13. The appraisal report explains that, under the cost approach, "property is valued based upon the market value of the land, as vacant, to which the depreciated replacement cost of the improvements and equipment is added."

The weight that the majority places on the Deal Highlights document is odd when one considers that Nomura itself thought that document worth only two fleeting references in its appellate brief. The majority's vastly understated concession that the Deal Highlights document was not "the primary focus of Nomura's brief" cannot hide the fact that this document—which, to reiterate, neither side mentioned at its own instance at oral argument on appeal, which was only made part of the record at the motion court's request, and which Nomura did not show to its expert witnesses—was not any kind of focus of Nomura's arguments, primary or otherwise, either here or before the motion court.[14] Plainly, Nomura's brief does not suggest the majority's apparent view that the Deal Highlights documents is the one piece of evidence in this extensive record on which the outcome of the appeal should hinge. Rather, Nomura argued that Cadwalader failed to give it proper advice about the REMIC rules and that it was Cadwalader's job to conduct due diligence to confirm that each securitized loan had a REMIC-qualifying VTL ratio—arguments that the majority expressly rejects, and with good reason. Although the majority asserts that "Nomura did not rely solely on th[e] [Deal Highlights] document," it is closer to the truth to say that Nomura did not rely on this document at all, and certainly did not point to it as the "red flag" perceived by the majority.[15] Moreover, the majority overstates the importance of the Deal Highlights document to the motion court's decision. That document was not the linchpin

---

**14.** The first reference to this document in Nomura's brief is a record citation in the facts section offered as partial support for the statement that Nomura sent Cadwalader "detailed information about the characteristics of each loan." The brief's second reference to the document is in a brief quotation from the motion court's decision. Given that Nomura's respondents' brief barely touches on the Deal Highlights document, Cadwalader can hardly be faulted for not referring to that document in its reply brief.

**15.** In the brief letter it submitted in response to the motion court's inquiry regarding the Deal Highlights document, Nomura nowhere referred to that document as a red flag. Rather, Nomura asserted that the Deal Highlights document (1) "highlights the fact that Cadwalader was well aware that the D5 Securitization included a loan secured by a free standing acute care hospital" and (2) "further demonstrates that none of the other advisors retained by [Nomura] . . . addressed the REMIC regulations and/or whether the [Doctor's Hospital loan] was 80% secured by real property within the meaning of those regulations." As to the first point, Cadwalader does not claim to have been unaware that Doctors Hospital was "a free standing acute care hospital." As to the second point, Cadwalader does not argue that it should have been granted summary judgment on the ground that Nomura should have looked to other advisors for advice on the Doctors Hospital loan's compliance with REMIC regulations.

of the motion court's denial of Cadwalader's summary judgment motion, as it is of the majority's decision. There is no indication in the motion court's decision that it would have reached a different result had Cadwalader not been provided with the Deal Highlights document, nor did the motion court—or, for that matter, Nomura's eminent counsel—describe it as "critical," as the majority does.

The majority's grounding of its decision on the Deal Highlights document, after rejecting all of Nomura's arguments on the issue of whether malpractice occurred, no doubt comes as a surprise to both parties. That Nomura relied primarily on a "broader theory" did not preclude it from making a secondary argument that Cadwalader's liability could be predicated on its receipt of the Deal Highlights document. It is of course true that a skilled advocate, rather than making every conceivable argument in support of the client's position, generally strives to focus the court's attention on the client's strongest arguments. This only makes it more surprising that the majority decides the appeal based on an argument that Nomura's counsel apparently found not worth making to us, even as a backup. In deciding the appeal on this ground, the majority is not merely "narrowing the issues for trial" (as it claims), but is itself creating, and treating as the sole ground for disposition (unlike the motion court), a new issue that neither of the parties has raised.[16]

If the Deal Highlights document could reasonably be viewed as a "red flag" that should have prompted further inquiry by Cadwalader, I would concur in the majority's determination, notwithstanding that the parties and their able counsel apparently overlooked this document's significance. I cannot see, however, that counsel for either side made any mistake in placing little or no weight on the Deal Highlights document, which, so far as can be determined from this extensive record, did not contain any information that would have materially distin-

---

**16.** While the majority takes umbrage at my statement that it has created the issue on which it is deciding the appeal, I think that this is a fair characterization, given the scant attention paid to the Deal Highlights document in Nomura's appellate brief, and given that, at oral argument, (1) the document was referenced in only one question from the bench, (2) that reference was misunderstood by the attorney to whom it was addressed (Cadwalader's counsel), and (3) Nomura's counsel did not subsequently make use of, or even mention, the document in her argument. I agree that is impossible to cover exhaustively every facet of a case as complex as this one at oral argument, but the majority's giving outcome-determinative effect to a single document that was not even mentioned in either side's presentation—even after a justice referred to it in a question—is, to say the least, unusual in the extreme.

guished the Doctors Hospital loan from the other 155 loans involved in the securitization. If Cadwalader was obligated to make further inquiry about Doctors Hospital based only on the knowledge that the hospital was a going concern and that the law firm had not been given a breakdown of the appraised value into real-estate and non-real-estate elements, Cadwalader would have been obligated to make further inquiry about every one of the 156 loans—essentially, to conduct the due diligence for which its highly sophisticated investment-banking client had deliberately declined to engage it. It is troubling that the majority's decision requires a law firm to stand trial for malpractice in failing to perform a function for which, as is undisputed, its highly sophisticated client, in order to minimize the costs of the transaction, deliberately chose not to engage it.

For the foregoing reasons, I would reverse the order appealed from and grant Cadwalader's motion for summary judgment dismissing the first cause of action in its entirety. Accordingly, I respectfully dissent from the contrary result reached by the majority.[17]

SWEENY and RENWICK, JJ., concur with RICHTER, J.; FRIEDMAN, J.P., dissents in part in a separate opinion.

Order, Supreme Court, New York County, entered on or about January 13, 2012, modified, on the law, to grant the motion with respect to that part of the cause of action alleging that defendant failed to properly advise plaintiffs, and otherwise affirmed, without costs.

---

**17.** Since I find that the record establishes that Cadwalader did not commit malpractice, I find it unnecessary to reach Cadwalader's arguments that the conduct complained of did not proximately cause any damage to Nomura.